J-S24016-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: M.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 194 WDA 2025 |

Appeal from the Order Entered January 23, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000059-2024

BEFORE: NICHOLS, J., McLAUGHLIN, J., and LANE, J.

MEMORANDUM BY McLAUGHLIN, J.: **FILED: September 24, 2025**

M.M. ("Father") appeals from the order terminating his parental rights as to his minor child, L.M. ("Child"). He challenges the sufficiency of the evidence. We affirm.

Child was born in March 2023. At the time of Child's birth, the Allegheny County Office of Children, Youth and Families ("CYF") received a report that K.M. ("Mother")[1] and Child tested positive for drugs. N.T., 1/16/25, at 52-53. Father is listed on Child's birth certificate, and he signed an acknowledgment of paternity. *Id.* at 52. As a result of testing positive for drugs, Child stayed in the NICU for approximately one month. *Id.* at 53. When Child was discharged from the hospital, CYF obtained an emergency order and placed Child with Mother's cousin ("Foster Mother") and her husband ("Foster

---

[1] Mother filed an appeal from the order terminating her parental rights at No. 248 WDA 2025.

Father") (collectively, "Foster Parents"). ***Id.*** Child was adjudicated dependent in May 2023. ***Id.*** at 55. Child has been living with Foster Parents since her discharge from the hospital, and it is a pre-adoptive home. ***Id.*** at 26-27, 69.

On July 2, 2024, CYF filed a petition for involuntary termination of parental rights. A hearing on the petition was held on January 16, 2025. At the time of the hearing, Child had been in placement her entire life, or approximately 21 months. ***Id.*** at 70.

At the termination hearing, CYF presented the testimony of its case supervisor, Olivia Martin. Martin testified that Father was currently incarcerated, and his goals were to participate in drug and alcohol treatment, resolve his legal issues, visit Child, and address intimate partner violence ("IPV"). ***Id.*** at 55, 60, 88. Martin noted that Mother had a protection from abuse ("PFA") order against Father, but Mother and Father continued to see each other. ***Id.*** at 57-58, 78. When Child was initially placed with Foster Parents, Father was not incarcerated and had visits with Child at the CYF office, but the visits were not consistent. ***Id.*** at 59-60, 84. Father became incarcerated in August 2023. ***Id.*** at 84-85. In late October 2023 or early November 2023, Father went to a drug and alcohol program at the Renewal Center but absconded from Renewal from November 2023 to August 2024. ***Id.*** at 85. During that period, Father had no contact with CYF or Child. ***Id.*** at 59. Martin testified that Father returned to prison in August 2024, and virtual visits were scheduled. ***Id.*** at 60. Father's last in-person visit with Child was in October 2023. ***Id.*** at 60-61. Martin stated that Father failed to complete a

drug and alcohol program, engage in IPV treatment, or consistently maintain contact with CYF. *Id.* at 58, 65, 85.

Martin further testified that Child is "very attached" to Foster Parents and is happy in her foster home with Foster Parents' other children. *Id.* at 71, 86. She emphasized that Child needs permanency and termination of parental rights would best serve her needs and welfare. *Id.* at 71-72.

Cassie McElhain, CYF caseworker, testified that since Father returned to prison in August 2024, he had seven 30-minute virtual visits with Child. *Id.* at 92-93. She stated that Child "doesn't really know [Father]" and during the virtual visits Child "will come to the screen occasionally, she's curious, but she is not quite two years old, so her attention span is very limited." *Id.* at 93. McElhain testified that Father reported to her that he has completed some programs while in prison and he wants to enter a 12-step program; however, she was not given any verification of these programs. *Id.* at 90, 104. Father also informed McElhain that he continued to use substances after he absconded from Renewal until he was reincarcerated in August 2024. *Id.* at 105. McElhain said that CYF did not have any evidence that Father maintained sobriety outside of a supervised setting. *Id.*

McElhain further testified that she observed love and affection between Child and Foster Parents in the foster home. *Id.* at 105. She stated that Child is "very happy" in her foster home and "at her age she doesn't know any differently. This is just her home, this is her family." *Id.* at 94-95. McElhain stated that Foster Parents fully meet Child's day-to-day needs. *Id.* at 106.

Lori Marshall, a caseworker from A Second Chance, Inc., testified that Father had in-person visits with Child until he was incarcerated in October 2023. *Id.* at 110. She stated that Father interacted well with Child during the visits. *Id.* Consistent with Martin's testimony, Marshall testified that Father stopped visiting Child after he left Renewal and his whereabouts were unknown. *Id.* at 111. Marshall stated that Father "just recently" started virtual visits with Child since his reincarceration. *Id.* She said that during the virtual visits, Foster Parents inform Father about updates on Child. *Id.* at 111-12.

Marshall further testified that Child is "very attached" and "very bonded" to Foster Parents, particularly to Foster Father because he is at home with her during the day. *Id.* at 116-17, 119. Marshall also observed that Child has a good relationship and bond with Foster Parents' three other children. *Id.* at 117. She opined that all of Child's needs are being met in the foster home. *Id.*

Dr. Patricia Pepe, a licensed psychologist and expert in forensic psychology, testified that Father failed to attend his virtual evaluation with her. *Id.* at 19, 32-33. Dr. Pepe testified that Child views Foster Parents as her "psychological parents" and her "primary attachment and primary bond" is with Foster Parents. *Id.* at 27, 29. She stated that Foster Parents' other children in the home are very attached to Child. *Id.* at 27. Dr. Pepe expressed that Child needs permanency and should be permitted to be adopted. *Id.* at 28. Dr. Pepe noted that while Child has virtual visits with Father from prison, it is difficult for Child to form a bond over virtual visits due to her young age.

*Id.* at 27, 36. She explained, "I don't think a two-year-old would have a level of attention necessary to develop an attachment or develop a bond virtually, because . . . they're all over the place" and "their attention span is playing with this, playing with that, and [Child's] was like that." *Id.* at 36.

Father testified that since his reincarceration in August 2024, he has completed several programs, including anger management, adapting to change, and drug and alcohol. *Id.* at 123. He presented certifications of completion for these programs. *Id.* at 126-27. Father said that he intended to enroll in a 12-step recovery program "either whenever [his] case is done or [he will] try to get [his] lawyer to file a motion on [his] behalf to go early[.]" *Id.* at 124. Father testified that he has a history of drug and alcohol use, but he had been clean for five months, which corresponded to the time he was incarcerated. *Id.* at 128-29. He stated that he was scheduled to be released from prison in April 2025 and will enter an intensive outpatient recovery program upon his release. *Id.* at 129. Father said he was unsure of his housing plans, but he would either go to his sister's house or a three-quarter house. *Id.* at 129.

Father further testified that he left Renewal in November 2023 because he got into an altercation with another person there. *Id.* at 132. When he left Renewal, he went "[t]o the streets" and was homeless. *Id.* at 132-33. Father admitted that he was using drugs during this time and had no contact with Child or CYF. *Id.* at 133. However, he said that Mother would send him pictures of Child. *Id.*

Father testified that he loves Child "very much" and did not want to give up his parental rights. *Id.* at 125-26. He stated that virtual visits with Child were going well, and Child recognizes him and tells him that she loves him. *Id.* at 130. Father conceded that he was not in a position to care for Child due to his incarceration. *Id.*

At the conclusion of the termination hearing, the court terminated Father's parental rights. This appeal followed.

Father raises the following issues:

1. Did the trial court abuse its discretion and/or err as a matter of law by involuntarily terminating Father's parental rights pursuant to 23 Pa.C.S.[A.] § 2511(a)(1), (2), (5), and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S.[A.] § 2511(b)?

Father's Br. at 3.

We review an order involuntarily terminating parental rights for an abuse of discretion. *In re G.M.S.*, 193 A.3d 395, 399 (Pa.Super. 2018). We "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012)). "If the factual findings have support in the record, we then determine if the trial court committed an error of law or abuse of discretion." *In re Adoption of K.C.*, 199 A.3d 470, 473 (Pa.Super. 2018). We will reverse a termination order "only

upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." ***In re Adoption of S.P.***, 47 A.3d at 826.

A party seeking to terminate parental rights has the burden of establishing grounds for termination by clear and convincing evidence. ***In re Adoption of K.C.***, 199 A.3d at 473. "Clear and convincing evidence is evidence 'that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue.'" ***Id.*** (citation omitted).

Termination of parental rights is controlled by Section 2511 of the Adoption Act. ***In re L.M.***, 923 A.2d 505, 511 (Pa.Super. 2007). Under this provision, the trial court must engage in a bifurcated analysis prior to terminating parental rights:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***Id.*** (citations omitted). To affirm the termination of parental rights, this Court need only affirm the trial court's decision as to any one subsection of Section 2511(a). ***In re B.L.W.***, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

Here, the court terminated Father's parental rights pursuant to Section 2511(a)(1), (2), (5), and (8), as well as under Section 2511(b). As only one basis for termination under Section 2511(a) is necessary, we will focus our attention on the court's termination of Father's parental rights pursuant to Section 2511(a)(1). That section provides that a parent's rights to a child may be terminated if "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S.A. § 2511(a)(1). *See In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008).

A parental obligation is a "positive duty which requires affirmative performance" and "cannot be met by a merely passive interest in the development of the child." *In re C.M.S.*, 832 A.2d 457, 462 (Pa.Super. 2003) (citation omitted). Additionally,

> [p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004) (citations omitted).

Father argues that he was continuously involved with Child until the time he absconded from Renewal "and then could not get directly involved during that period of time because he was on the run from an [a]rrest [w]arrant." Father's Br. at 14. He asserts since being reincarcerated he has "renewed contact with the Child and he also maintained contact with CYF and attempted to comply with the Court Orders, as best as possible given his circumstances of incarceration, by taking classes online." *Id.*

The court found that Father failed to complete his court-ordered goals. It explained:

> Father was ordered to address drug and alcohol issues by undergoing an assessment and comply with recommendations, address IPV/DV issues . . ., maintain contact with CYF, address and resolve his active criminal cases, and have supervised visitation with Child.

> CYF Caseworker Marshall testified that Father failed to maintain contact with CYF. There were long periods of time when Father had no contact with the agency or his Child and Father's whereabouts were unknown. On or around November 2023, CYF learned that Father was incarcerated at the Allegheny County Jail and contact resumed. Father was transferred from the Allegheny County Jail to alternative housing at the Renewal Center during that same time period; however, Father got into a fight with another inmate at the Renewal Center and absconded from the facility as a result. Father had no contact with Child during this period. Father stayed on the run from November 2023 to August 2024. Father has been in the Allegheny County Jail from August 2024 to the time of the hearing.

> CYF was not aware of any programs or services Father engaged during his time on the run. Father was provided with a Father Engagement Specialist to assist him . . .; however, Father failed to take advantage of this opportunity. Further, Father flagrantly admitted to CYF that

- 9 -

he was having contact with Mother while subjected to an active PFA Order.

Father told CYF that he was enrolled in online programs while at the [prison], but did not provide any verification to CYF. At the TPR hearing, Father in his defense, provided testimony and exhibits demonstrating that he . . . completed [a] 12-step recovery program, a drug and alcohol program, accessibility classes, adapting to change, and anger management. Although Father did engage in these classes, the certificates of completion are all dated November 4, 2024 or later, which is [four] months after the TPR petition's filing. While the [c]ourt acknowledges Father's efforts while incarcerated, it is tempered with Father's inaction while at liberty.

Finally, Father's visits with Child were inconsistent. Father had no known contact with Child from the time he absconded from the Renewal Center in November 2023 until his apprehension and incarceration at the Allegheny County Jail in October 31, 2024.

Virtual visits with an inmate have inherent obstacles and, in this case, setbacks included lockdowns, broken equipment, scheduling issues as well as the Child's availability. CYF logged a total of 7 visits, a half-hour in duration, since Father has been in the Allegheny County Jail.

The court found that Father provided no credible evidence or testimony to rebut CYF, nor did he demonstrate that he addressed any of the goals to remedy the issues that lead to the Child's removal, which was overwhelmingly supported by the record. Further, Father failed to recognize or acknowledge his duties as a parent to this Child as evident in the record through his interactions with CYF. Father failed to complete any goals when not incarcerated to demonstrate to the court he was ready, willing or able to exercise any parental duties and responsibilities.

Trial Court Opinion, filed 3/24/25, at 26-29 (footnotes omitted).

The record supports the court's findings. The termination petition was filed in July 2024. CYF produced clear and convincing evidence of Father's failure to perform parental duties for at least the six months prior to the filing

of the termination petition. Father had no contact with Child or CYF for approximately nine months while he was on the run. Father also failed to complete any goals or programs prior to the filing of the termination petition. Accordingly, there was sufficient grounds to support the finding of termination under Section 2511(a)(1).

We next consider the court's finding that termination was warranted pursuant to Section 2511(b). Under Section 2511(b), the trial court must consider "the developmental, physical and emotional needs and welfare of the child" to determine if termination of parental rights is in the best interest of the child. **See** 23 Pa.C.S.A. § 2511(b). The court must also examine the parent-child bond, "with utmost attention to the effect on the child of permanently severing that bond." **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa.Super. 2005).

In addition to examining the parental bond, the court must consider other important factors, including "the child's need for permanency and length of time in foster care," "whether the child is in a pre[-]adoptive home and bonded with foster parents," and "whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." **Int. of K.T.**, 296 A.3d 1085, 1113 (Pa. 2023).

Here, the court found that there was no parent-child bond between Father and Child. It explained:

It is in the [c]ourt's opinion that Father is not in the position to parent and there has been no evidence of any bond between himself and Child. Father failed to appear for his psychological and interactional evaluation with Dr. Pepe.

Furthermore, the record is void of any real interaction between them. The only contact is a brief period of virtual visits. Therefore, the [c]ourt finds that no beneficial bond exists between Father and Child. There is no detriment to severing this relationship.

Trial Ct. Op. at 35-36. The court also considered the evidence that Child was strongly bonded to her foster family, is happy in the foster home – which is a pre-adoptive home – and had been in care for 21 months in determining that termination of Father's parental rights was in Child's best interest.

The record supports the court's factual findings and it committed no error of law or abuse of discretion. The evidence clearly shows that Child is secure, loved, and thriving in Foster Parents' pre-adoptive home, where she has lived in her entire life. Father has never had Child in his care and has failed to demonstrate that he can meet Child's needs. There was testimony that Child does not really know Father and was distracted during the virtual visits due to her young age. The evidence shows that Child would suffer no detrimental impact if Father's parental rights were terminated. Accordingly, CYF proved by clear and convincing evidence that termination of Father's parental rights was in Child's best interest.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


DATE: 9/24/2025